EMILY A. GARDNER    6891
Attorney at Law
Dillingham Transportation Building
735 Bishop Street, Suite 402
Honolulu, Hawai'i 96813
Telephone: (808)-540-0200
Facsimile: (808)-540-0201
Email: eagardner@hawaii.rr.com

Attorney for Plaintiffs

UMV

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED
2007 MAY 11 AM 9:28
F. OTAKE
CLERK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| Valerie Sylvester, David Pang, Andrew Garcia, Ruth Camargo, Chris Hubbard, Stacey Collins, Randall Bandmann and Kelly Engle<br><br>Plaintiffs,<br><br>v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unicorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>Defendants. | Civil No. 07-1-0848-05 SSM<br>(Non-Vehicle Tort)<br><br>REQUEST TO EXEMPT FROM COURT ANNEXED ARBITRATION PROGRAM; SUMMARY OF FACTS |

REQUEST TO EXEMPT FROM COURT ANNEXED ARBITRATION PROGRAM

COMES NOW Plaintiffs Valerie Sylvester, David Pang, Andrew Garcia, Ruth Camargo, Chris Hubbard, Stacey Collins, Randall Bandmann and Kelly Engle, by and through their attorney, Emily A. Gardner, and hereby requests that the above-entitled action be exempt from the Court Annexed Arbitration Program, as the probable jury award, not reduced by the issue of liability, and exclusive of attorneys fees, interest and cost is in excess of $150,000.

EXHIBIT C

Dockets.Justia.com

This request is made pursuant to Rule 8(A) of the Hawaii Arbitration Rules, as amended, and the Summary of Facts attached hereto.

DATED: HONOLULU, HAWAII, May 11, 2007

_____
EMILY A. GARDNER
Attorney for Plaintiffs

EXHIBIT C

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| Valerie Sylvester, David Pang, Andrew Garcia, Ruth Camargo, Chris Hubbard, Stacey Collins, Randall Bandmann and Kelly Engle<br><br>                Plaintiffs,<br><br>   v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unicorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>                Defendants. | Civil No. _____<br>(Non-Vehicle Tort)<br><br>SUMMARY OF FACTS |

SUMMARY OF FACTS

1.    In March 2007 Menu Foods recalled 53 brands of cuts and gravy style wet dog food and 42 brands of cuts and gravy style wet cat food which had caused dogs and cats to become ill. One common symptom in the sick dogs and cats was kidney failure, known as acute renal failure. The dog and cat foods was ultimately found to have been contaminated with aminopterin (rat poison) and melamine, an industrial chemical used in fertilizers and manufacturing plastics banned for use in the United States.

**Menu Foods Claims About the Quality of its Pet Food**

2.    Menu Foods is the largest maker of wet dog and cat food in North America, with its products sold under 95 brand names, which the company identifies as supermarkets, big box and pet product retailers and wholesalers. Menu Foods


EXHIBIT C

manufactures pet food for 17 of the top 20 North American retailers and is also a contract manufacturer of branded pet food products, manufacturing for five of the top six branded companies in North America. It is the only manufacturer in North America offering wet food in pouch format. Menu Foods holds itself out to the public as a manufacturer of safe, nutritious, and high-quality dog and cat food.

3. In conjunction with the sale of its products, Menu Foods marketed, advertised and warranted that its pet food was fit for the ordinary purpose for which it was sold – consumption by dogs and cats-- and that its products were safe and free from defects. Menu Foods produces its pet food products intending that consumers will purchase the pet food products, regardless of brand or label name, place of purchase or the location where pets actually consume them. Menu Foods pet food products were intended to be placed in the stream of commerce and distributed and offered for sale and sold to Plaintiffs in Hawaii to feed to their pet dogs and cats.

4. Menu Foods makes numerous express warranties about the quality of its food and its manufacturing facilities. For example, Menu Foods touts the claim that it "manufacture[s] the private-label, wet pet-food industry's most comprehensive product program with the highest standards of quality" and it operates "state-of-the-art" manufacturing facilities in the United States and Canada. Menu Foods intended for pet owners to believe its statements and trust that its pet food is of first-rate quality.

### Menu Foods Use of Adulterated Wheat Gluten

5. In late 2006, Menu Foods began to use a new supplier of wheat gluten from China named Xuzhou Anying Biologic Technology Development Company Ltd. ("Xuzhou"). In wet pet food, wheat gluten is added to provide a meaty

2

EXHIBIT C

texture and as a binding agent. A meaty texture is an important characteristic of wet pet foods.

6. Despite the fact that Menu Foods was purchasing a *major ingredient* used in many of the foods it manufactures from a new supplier, Menu Foods did not test or otherwise determine whether or not the wheat gluten it was purchasing was safe for its intended purpose—consumption by dogs and cats. As North America's leading manufacturer of wet dog and cat foods—for more than 95 different brands—Menu Foods merely went on the assumption that the new wheat gluten, purchased from a foreign provider, would perform safely and as intended.

7. In May, 2007, reports surfaced indicating that the wheat gluten Menu Foods purchased from Xuzhou, was actually flour "spiked" with melamine, to increase the apparent protein content.

### Menu Foods Discovery of Adulterated Pet Food & Voluntary Recall

8. In late 2006 through the early part of 2007, Menu Foods began to receive complaints from veterinarians and consumers who had been feeding their dogs and cats Menu Foods products, that the products were thought to be making dogs and cats severely ill and/or die. The FDA also reported receiving thousands of consumer complaints about Menu Foods pet products from veterinarians and people having dogs and/or cats that consumed the tainted food. On information and belief, Menu Foods may have first learned that its pet food was causing health problems to the dogs and cats that ate it in December of 2006. However, Menu Foods had actual knowledge of the contamination at least by February 20, 2007.

EXHIBIT C

9. On or about February 27, 2007, Menu Foods began testing its products on between 40 to 50 dogs and cats. Between 7 and 10 of those dogs and cats died during the test period.

10. On or about March 6, 2007, Menu Foods switched to a different supplier of wheat gluten.

11. On or about March 16, 2007-- almost <u>one month after</u> confirming that its products were causing illness and death in dogs and cats, and <u>ten days after</u> it secured a new supplier for wheat gluten so that it could continue to manufacture its products--Menu Foods initiated a recall of 51 brands of "cuts and gravy" style dog food and 40 brands of "cuts and gravy" style cat food, all produced at Menu Foods' U.S. facilities between Dec. 3, 2006, and March 6, 2007. The original recall involved 91 different products and 60 million cans and pouches of cat and dog food.

12. On March 23, 2007 New York State health officials reported that laboratory tests of the recalled Menu Foods products revealed the presence of aminopterin (rat poison) at levels of at least 40 parts per million. The pet food samples were tested by the New York State Animal Health Diagnostic Center at Cornell University and New York State Food Laboratory, which identified aminopterin as a contaminant.

13. On March 30, 2006, reports indicated that melamine, an industrial chemical used in manufacturing plastics and fertilizer was also present in Menu Foods products. More recently, melamine has become the focus of the investigation.

14. On March 30, 2007, Menu Foods asserted that the pet food manufactured in its Emporia, Kansas and Pennsauken, New Jersey facilities *after* March

EXHIBIT C

6, 2006 was "safe and healthy" because it contains no melamine, no wheat gluten from Xuzhou, and that "those products not associated with the suspect wheat gluten performed very well and in a manner consistent with historic norms."

15. The Menu Foods product recall list has been amended several times since March 16, 2006 to include additional brands and expanded to include products manufactured back to November 8, 2006. The most recent expansion occurred on or about May 2, 2007 and was implemented to address cross-contamination in products manufactured during the same time the products containing the toxic wheat gluten were manufactured. Menu Foods current recall list includes 220 different products.

16. After announcing the recall, Menu Foods requested that consumers return all unused recalled product, or otherwise discard it. In many cases, this led to spoliation of evidence that may prove helpful to Plaintiffs' cases.

17. After announcing its original recall, Menu Foods expanded the recall several times by duration and by number of products affected. By effectuating the recall in such a way (e.g., in an expansive, as opposed to in a narrowing manner) Menu Foods put concerns regarding its profits over concerns regarding pet health. The gradated manner in which Menu Foods effectuated its recall also led to a great deal of confusion and misunderstanding among consumers.

18. Menu Foods has admitted that certain of its pet food products produced between November 8, 2006 and March 6, 2007 contained contaminants and that its products were contaminated and adulterated, defective and potentially causing injury and death to dogs and cats (not fit for their intended purpose).

EXHIBIT C

### FDA and State Regulatory Confirmation of Contamination and Adulteration

19. The FDA reported that as many as one in six dogs and cats died in tests conducted by Menu Foods on its pet food products in February 2007 after Menu Foods received reports that its pet food was poisoning and killing pets. The FDA also has reported receiving thousands of consumer complaints about Menu Foods pet products from veterinarians and people having dogs and/or cats that consumed the tainted food.

20. The FDA has concluded that "the association between melamine in the kidneys and urine of cats that died and melamine in the food they consumed is undeniable. Additionally, melamine is an ingredient that should not be found in pet food at any level. Exhibit "2" http://www.fda.gov/cvm/MenuFoodRecallFAQ.htm.

21. The ACVIM (American College of Veterinary Internal Medicine) has "recommended that pets (dogs and cats) that ingested pet food that was on the recall list, whether showing signs of illness (lethargy, vomiting, diarrhea, anorexia, etc.) or not (asymptomatic) should be seen by their veterinarian for baseline blood chemistries and urinalysis in order to ascertain the status of their renal (kidney) function. (The ACVIM is the Official Organization of the Veterinary Specialties of Small Animal Internal Medicine, Large Animal Internal Medicine, Cardiology, Neurology, and Oncology)

### Hawai'i Food, Drug and Cosmetic Act – HRS Chapter 328

22. Under the Hawai'i Food, Drug and Cosmetic Act "food" is defined as "articles used for food or drink by humans, dogs or cats." HRS § 328-1.

23. HRS Chapter 328 applies to Defendants because they are engaged in the "selling of food... includ[ing] the manufacture, production, processing, packing, exposure, offer, possession, and holding of any such article for sale..." HRS § 328-5.

EXHIBIT C

24. Under "HRS §328-6, Prohibited acts, the following acts and the causing thereof within the State by any person are prohibited: (1) The manufacture, sale, delivery, holding, or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded..."

25. Under HRS § 328-9(1), " A food shall be deemed to be adulterated... (A) If it bears or contains any poisonous or deleterious substance which may render it injurious to health...[or]...(C) If it ....is otherwise unfit for food..."

26. Defendant sold pet food products that -- by Defendants' own admissions and the findings of federal and state agencies-- were adulterated within the meaning of HRS Chapter 328, that contained poisonous or deleterious substances which may render them injurious to health and/or that were otherwise unfit for food.

27. Defendants' recall of its pet food products confirm that its products were unfit for food.

28. Plaintiffs, as described in detail below, are all persons who: 1) purchased dog and/or cat food products manufactured by Menu Foods and included on the company's recall list; 2) fed it to their dogs or cats during the period between November 8, 2006 and the date the recall was announced, March 16, 2007, and 3) suffered economic and non-economic damages due to the fact that their pet dog(s) or cat(s) became ill and/or died.

29. Plaintiffs are seeking actual damages (including all general, special, incidental and consequential damages) for the costs associated with purchasing the adulterated and contaminated food, for any and all out of pocket expenses associated with purchasing replacement foods, for obtaining necessary veterinary care and

EXHIBIT C

treatment; paying for medicines and/or veterinary supplies; for costs associated with post-mortem examinations and/or necropsies; for costs associated with cremation and/or burial of remains; for wage loss incurred as a result of having to provide care for a sick dog or cat; and/or for costs associated with the rendering of psychiatric services to surviving owners, and punitive damages, as permissible by law. Plaintiffs are also seeking other economic and non-economic damages incurred including but not limited to damages representing the intrinsic, special or unique value of Plaintiffs' deceased pet dogs or cats; damages relating to loss of use of Plaintiffs' pet dogs or cats; damages relating to severe emotional distress, interference with Plainitffs' lives and the quiet enjoyment of their realty and personalty; all subject to proof and modification at trial.

30. This case is also a prime punitive damages case. Defendants, as North America's leading manufacturer of wet dog and cat foods—for more than 95 different brands—are a multi-million dollar corporation which holds the health of millions of America's pets directly in their hands. Despite the fact that Defendants purchased a major ingredient (wheat gluten) in their food from a new, foreign supplier, Defendants did not test or otherwise determine whether or not the wheat gluten was safe for its intended purpose prior to incorporating it into the more than 95 different products it manufactures. Shockingly, Defendants did not even confirm that the product it purchased was, in fact, wheat gluten.

31. Moreover, even when Defendants knew or should have known that their products were unsafe after receiving numerous complaints from veterinarians and consumers—they failed to take timely action to prevent their products from being offered for sale, sold or fed to pet dogs and cats.

EXHIBIT C

32. Defendants could have easily discovered the defect in their food product at little cost, by just checking the ingredients it purchased from a new, foreign supplier. Particularly when coming from China, a country where scandals over contaminated or unsafe food are routine, and foreseeable. Defendants' conduct, by purchasing cheaper ingredients from oversees, failing to perform any quality testing, whatsoever—even to confirm that the product was what they ordered, and the lax manner in which they effectuated the recall all were actions that put their profits above pet health. Imposing punitive damages on Defendants will promote product safety by encouraging others to anticipate and test for foreseeable defects.

33. Due to the above-described damages, Plaintiffs believe that the probably jury award, not reduced by the issue of liability, and exclusive of attorney's fees, interests and costs will be in excess of $150,000.

34. If Plaintiffs were permitted to pray for a specific amount of punitive damages, we would seek over $500,000 due to the grossly negligent and outrageous conduct of Defendants.

35. For the aforementioned reasons, Plaintiffs request that this case be exempted from the Court Annexed Arbitration Program.

DATED: Honolulu, Hawaii, May 11, 2007.

_____
EMILY A. GARDNER
Attorney for Plaintiffs

EXHIBIT C